<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SERGIO S.E, | : | |
| Petitioner, | : | Civil Action No. 20-3982 (JMV) |
| v. | : | **OPINION** |
| ORLANDO RODRIGUEZ, et al., | : | |
| Respondents. | : | |

**VAZQUEZ, District Judge:**

This matter originated with a Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. Presently pending before the Court is Petitioner Sergio S.E.'s,[1] ("Petitioner") habeas petition and request for immediate release. D.E. 1. The Court construes the request for immediate release as a motion for temporary restraints ("TRO"). For the reasons detailed below, the Court will deny the habeas petition and the request for immediate release.

---

[1] Petitioner is identified herein only by his first name and the first initials of his surname in order to address certain privacy concerns associated with § 2241 immigration cases. This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

**I.      Background**

Petitioner is an immigration detainee being held by the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE") at the Elizabeth Contract Detention Facility ("ECDF") in Elizabeth, New Jersey. The instant motion was filed in the wake of the ongoing COVID-19 pandemic,[2] that has been reported to have been contracted by both personnel and detainees at ECFDF. D.E. 11-5 at 4. Petitioner submits that he has tested positive for COVID-19 and asks the Court to order his immediate release. D.E. 1 at 3.

Petitioner is forty-one years old and has been detained at ECDF since March 17, 2020. D.E. 11 at 15. Petitioner is subject to mandatory detention under 8 U.S.C. § 1231(a). *Id.* at 7. On March 17, 2020, Petitioner was served with a "Notice of Intent/Decision to Reinstate Prior Order" notifying him of DHS's intent to reinstate an order of removal entered against him on June 18, 2000. D.E. 11-8 at 1. Petitioner was previously removed on June 19, 2000, and subsequently unlawfully reentered the United States twice. *Id.*, 11-7 at 3-4. Petitioner's medical records provide that he informed a medical staff member that his flight was cancelled on March 24, 2020. D.E. 11-10 at 47. Petitioner submits that he, through counsel, has "applied for reasonable fear proceedings." D.E. 1 at 1, 1-1.

---

2 COVID-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020. *See* Centers for Disease Control and Prevention *Coronavirus Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/ (last visited Apr. 7, 2020).

On April 11, 2020, Petitioner filed a petition for writ of habeas corpus challenging the conditions of his confinement pursuant to 28 U.S.C. § 2241. D.E. 1. On April 21, 2020, the Court convened a telephonic hearing with the parties to hear arguments. D.E. 12.

**A. COVID-19**

The COVID-19 pandemic is at the heart of this case. Judge John E. Jones III, in a thoughtful opinion, described the situation as follows:

> In a matter of weeks, the novel coronavirus COVID-19 has rampaged across the globe, altering the landscape of everyday American life in ways previously unimaginable. Large portions of our economy have come to a standstill. Children have been forced to attend school remotely. Workers deemed 'non-essential' to our national infrastructure have been told to stay home. Indeed, we now live our lives by terms we had never heard of a month ago—we are "social distancing" and "flattening the curve" to combat a global pandemic that has, as of the date of this writing, infected 719,700 people worldwide and killed more than 33,673. Each day these statistics move exponentially higher.

*Thakker v. Doll*, Civ. Docket No. 20-cv-480, --- F. Supp. 3d ---, 2020 WL 1671563, *2 (M.D. Pa. Mar. 31, 2020) (footnotes omitted). Judge Jones accurately pointed to the swift growth of cases. Since his opinion dated March 31, 2020, the number of worldwide cases and deaths has risen from 719,700 and 33,673 to 3,090,445 and 217, 769.[3]

New Jersey has been particularly hard hit, with the northern part of the state bearing the initial brunt. As of April 29, 2020, New Jersey had 116, 264 cases and 6,770 deaths. *COVID-19 Information Hub*, STATE OF NEW JERSEY, https://covid19.nj.gov/ (last visited April 29, 2020). The total number of cases and deaths for Bergen County, Essex County, and Hudson

---

[3] *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORGANIZATION, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited April 30, 2020).

County, respectively, were 15,446/1,057, 13,445/1,139, and 14,596/758 deaths. *Id.* New Jersey has taken numerous steps, such as the Governor's stay-at-home order issued on March 21, 2020, to combat the virus. In addition, New Jersey has closed schools indefinitely and closed beaches, state parks, and county parks.[4]

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably between people." *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html ("*How Coronavirus Spreads*") (last visited April 8, 2020). The National Institutes of Health reports that the virus "is stable for several hours to days in aerosols and on surfaces[.]"[5] COVID-19 is "spread mainly from person-to-person." *Id.* This person-to-person spread can occur (1) between persons who are in close contact, meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks. *Id.* The virus can also be spread by infected persons who are not showing symptoms. *Id.*

Symptoms of COVID-19 can be mild. However, the effects of COVID-19 can be drastically more severe in older individuals or those with certain medical conditions, including persons with asthma, lung disease, heart diseases, diabetes, chronic kidney disease, liver disease or those who are immunocompromised.[6] Besides death, COVID-19 can cause serious, potentially

---

[4] *New Jersey closes state parks, state forests and county parks as more than 200 new COVID-19 deaths reported*, 6abc, https://6abc.com/covid19-cases-us-coronavirus-symptoms/6083512/ (last visited April 7, 2020).

[5] *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 8, 2020)

[6] *People Who Are at Higher Risk of Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 8, 2020).

permanent, damage to lung tissue, and can require extensive use of a ventilator. Early evidence suggests that the virus "can damage lung tissue causing a 20 to 30 percent decrease in lung function[.]" D.E. 1 at ¶ 29 (citation omitted). In addition, complications from the virus can manifest rapidly. *Id.* (citation omitted). There is currently no vaccine for COVID-19, nor are there known, clinically-tested therapeutic treatments. *Id.* at ¶ 30. To combat the virus, health officials have emphasized education, social distancing (*i.e.* staying at least 6 feet apart), and improved hygiene. *Id.* (citation omitted).

### B. Facility Conditions

Petitioner argues that the conditions at ECDF endangers his life and that he threatens other detainees' lives as a result of his having contracted COVID-19. D.E. 1 at 2-3. Petitioner cites to a news report, quoting an ECDF detainee who alleged the facility has done "little or nothing" following confirmed positive cases among ECDF staff and that the detainees were not provided hand sanitizer or personal protective equipment. *Id.* at 10-11.

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure. *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/coronavirus (last visited on April 8, 2020). For example, ICE temporarily suspended all social visitation at detention facilities. *Id.* ICE also released approximately 160 individuals who were over the age of 60 or pregnant. *Id.* ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 as per CDC guidance. *Id.*

**ECDF**

Respondents submitted declarations from Orlando Rodriguez, the warden at ECDF, as well as from Captain Abelardo Montalvo, M.D., the Eastern Regional Clinical Director with ICE Health Service Corps ("IHSC"). D.E. 11-5, 11-6. Rodriguez details the efforts of ECDF to deal with the virus. D.E. 10-6. He reports that since March 1, 2020, ECDF is currently operating at more than fifty percent under capacity and that every "dorm" has fewer detainees than beds. *Id.* at ¶¶ 3-4. Rodriguez adds that while visitation of all kinds is limited, detainees are allowed to communicate with their attorneys. *Id.* at ¶ 6. Attorneys may schedule telephone calls with their clients Monday-Friday between 8 a.m. and 5 p.m. *Id.* at ¶ 7. Moreover, detainees may make these calls from a private area of the facility. *Id.* at ¶ 8. Rodriguez submits that he is not aware of any issues or complaints with Petitioner's access to his counsel. *Id.* at ¶ 9.

Captain Montalvo provides that as of the date of his declaration, April 17, 2020, twelve detainees and one staff member had tested positive for COVID-19. D.E. 11-5 at ¶ 16. There has been one ECDF IHSC staff member who tested positive for COVID-19.[7] *Id.* That individual's last day in the office was on March 9, 2020. *Id.* There have been five "Core Civic" ECDF staff members who tested positive for COVID-19. *Id.* The most recent positive member's last day was April 8, 2020. *Id.* There has been one positive ICE ECDF staff member who tested positive for COVID-19 on March 25, 2020. *Id.* That individual was cleared to return to work by his physician and returned on April 13, 2020. *Id.* One ICE ECDF staff member self-quarantined because his spouse tested positive for COVID-19. *Id.* This individual returned to work on April 13, 2020. All staff members who were in proximity of the infected staff members, were sent

---

7 ECDF personnel is comprised of 139 "Core Civic" employees, 24 IHSC employees and 20 ICE employees. D.E. 11-5 at ¶ 6.

home to self-quarantine for a fourteen-day period. *Id.*

Since the start of the COVID-19 crisis, ICE has issued guidance to field staff on screening and management of potential exposure among detainees. D.E. 11-5 at ¶ 5. New detainees are screened upon admission for fever and respiratory illness. *Id.* at ¶ 10. New detainees are also asked about recent travel history and contact with anyone confirmed as COVID-19 positive. *Id.* The information gathered at the intake screening determines whether ECDF will monitor or isolate the detainee. *Id.* at ¶ 11. The facility also requires that all personnel and vendors undergo medical screening including temperature readings before admission in the facility. *Id.* at ¶ 8. ECDF educates its staff and detainees as to the "importance of hand washing and hand hygiene," symptom education, and requesting to seek medical care if they feel ill. *Id.* at ¶ 7. Detainees are provided soap in the dorms and hand sanitizer is available in the medical clinic. *Id.* at ¶ 4. Cleaning and disinfecting beyond normal activity has been implemented per the Centers for Disease Control's ("CDC") recommendation. D.E. 11-5 at ¶ 5. ECDF is employing measures to promote social distancing such as suspended social visitation. *Id.* at ¶¶ 8, 11-14. Although ECDF does not have an on-site infirmary, it provides 24-hour access to sick calls in a clinical setting. *Id.* at ¶ 15. The facility also provides referrals to local hospitals for specialty care. *Id.*

Detainees who have had a known exposure to COVID-19 but who are asymptomatic are "cohorted," meaning that they are placed with other similar individuals for fourteen days. *Id.* at ¶ 17. "Co-horting is an infection prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic." D.E. 11-5 at ¶ 12. Cohorting "lasts for the duration of the incubation period of the 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms ad can serve as undetected source patients." *Id.* Detainees who test positive for COVID-19 are

7

housed in quarantine units   *Id.* at ¶ 15.

## II.     LEGAL STANDARD

Petitioner submits that the conditions of his confinement violate his Fifth Amendment due process rights.   D.E. 1 at 1-3, 7-16.   He also submits that the restriction on visitation infringes on his right to communicate with counsel and prepare for his immigration proceedings.   D.E. 1 at 14-15.   The Court construes Petitioner's request for immediate release as a motion for a temporary restraining order ("TRO") and/or preliminary injunctive relief.   *See McKinney v. Prosecutor's Office*, Civil Action 13-2553(KM)(SCM), 14-3563(KM)(SCM), 14-3564 (KM)(SCM), 2015 WL 1954460 at *8 (D.N.J. Apr. 29, 2015).

The standard for granting a temporary restraining order is the same as that for a preliminary injunction.   Injunctions and restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1.   Injunctive relief may only be granted when a party demonstrates that he has a reasonable probability of success on the merits, he will suffer immediate and irreparable harm if the injunction does not issue, the grant of preliminary relief will not result in greater harm to the nonmoving party, and the injunctive relief is in the public interest.   *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001)).

Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy.   *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted); *see also In re Souels*, 688 F. App'x 134,

135-36 (3d Cir. 2017).

### III. DISCUSSION

The Court finds that Petitioner has not established a reasonable likelihood of success on the merits. Before delving into the relevant analysis in this case, the Court notes the following. The Court is well-aware of the seriousness of the COVID-19 pandemic, and the Court likewise recognizes that county jails and detention facilities were not designed with pandemics in mind. During the pandemic, the Court has received requests for habeas relief from civil immigration detainees that fall into three general categories: (1) detainees who do not fall into a particularly vulnerable category; (2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and (3) detainees who have tested positive for COVID-19. As to the first category, the Court has denied relief without prejudice. At the same time, the Court recognizes that merely because a person does not fall into a vulnerable category does not mean that he or she will not experience severe symptoms if he or she contracts the virus. The Court has denied those petitions without prejudice because information concerning COVID-19 is subject to change, and as additional information becomes available, the Court could reach a different conclusion as to those detainees who currently are not considered unusually vulnerable. As to the second category, the Court has ordered release provided that the legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by the conditions of release. As to the third category – detainees who have the virus – the Court has found that the analysis changes. Before a detainee contracts the virus, the public has an interest in preventing further positive cases. In addition to the health and welfare of the detainee, the public also has an interest in seeing that scarce medical resources are conserved. Yet, once a detainee tests positive, the public also has an interest in not introducing additional cases into the general public. Once a

9

detainee tests positive, in the Court's view, the critical question is whether the detainee is receiving constitutionally adequate care. As a result, once a detainee tests positive, the Court does not order release but instead remains available on short notice to address any issues that may arise as to adequacy of medical care. To this end, the Court has inquired of facilities as to whether detainees can seek medical attention twenty-four hours a day (in case symptoms worsen) and, if necessary, how long it will take to transport a detainee to a hospital or medical center.

    A. Fifth Amendment Conditions of Confinement Claim

Petitioner is a civil detainee as opposed to a criminal prisoner who has been convicted and sentenced, therefore his conditions of confinement claim will be analyzed under the Due Process Clause of the Fifth Amendment, as opposed to the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979). Civil immigration detainees are entitled to the same due process protections as pretrial detainees when the conditions of confinement fall below constitutional minimums. *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).

The Third Circuit has articulated the following relevant standards:

> To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees."

*E. D. v. Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). As a result, the Court must ascertain whether the conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose. *Hubbard* 538 F.3d at 232.

A condition or purported deprivation amounts to punishment if the "disability is imposed

10

for the purpose of punishment" in other words, there is "an expressed intent to punish on the part of detention facility officials;" no "alternative purpose to which may rationally be connected is assignable for it" or is "excessive in relation to the alternative purpose assigned [to it]." *Bell*, 441 U.S. at 538 (internal citation omitted). The "inquiry into whether given conditions constitute punishment must consider the totality of circumstances within an institution." *Hubbard*, 399 F.3d at 160 (internal quotation marks and citations omitted).

District Courts have reached different conclusions when conducting this inquiry in the context of the current pandemic. In *Dawson v. Asher*, Case No. C20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020), Judge James L. Robart found that the immigration detainees did not face improper punishment. *Id.* at *2. Judge Robart explained that the petitioner's detention was reasonably related to a legitimate governmental objective because there was no evidence that the respondents intended to punish the petitioners, respondents had a legitimate governmental objective in preventing detained aliens from absconding and ensuring their appearance at removal proceedings, and the petitioners' confinement did not appear excessive in relation to the legitimate objective. *Id.*

The district judge in *Thakker v. Doll*, Civ. Docket No. 20-cv-480, - F. Supp. 3d -, 2020 WL 1671563, *8 (M.D. Pa. Mar. 31, 2020), reached a different conclusion. Judge John E. Jones III noted that an express intent to punish was not necessary and then found that the detention in question did not bear a rational relationship to a legitimate government objective. *Id.* Judge Jones reasoned that housing immigration detainees in close proximity and in unsanitary conditions, in light of the pandemic, did not meet a legitimate governmental objective. *Id.* Judge Jones indicated that preventing aliens from absconding would constitute a legitimate governmental aim but this objective was deeply weakened in light of COVID-19, particularly when ICE had many

other options to monitor civil detainees. *Id.*

The Court agrees with the *Thakker* court that COVID-19 alters the analysis. And, as noted, the Court also recognizes that jails are not designed with pandemics in mind. However, courts that have found that the conditions did not bear a rational relationship to a legitimate governmental interest in light of the pandemic, have also indicated that the individual detainee's underlying health condition weighed heavily in its analysis. *See, e.g.*, *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843, *8 (D.N.J. Apr. 9, 2020); *Thakker*, 2020 WL 1671563, *4, 6. The Court also agree that a petitioner's individual circumstances (that is, his or her medical condition) are critical to the analysis.

Respondents submit that Petitioner has not raised a valid constitutional claim. They argue that Petitioner is lawfully detained pursuant to 8 U.S.C 1231(a). D.E. 11 at 15-16. They further argue that Petitioner has not established that he is not receiving adequate medical care and treatment in light of his positive COVID-19 results. *Id.* at 12-20.

On or about April 5, 2020, Petitioner informed the facility medical staff that he was experiencing headache, chills, body aches, and nasal congestion. D.E. 11-10 at 41. The following day he was tested for COVID-19 and received his positive results three days later. *Id.* at 29, 37. The record reflects that Petitioner has been under constant medical attention before and after his COVID-19 positive test result. Nonetheless, he submits that "[d]etention without the prospect of adequate medical care does not serve a sufficiently compelling or narrowly tailored interest." D.E. 1 at 16. The Court credits Petitioner's medical records, which are a part of the record, that reflect otherwise. D.E. 11-10. His records indicate that his chief complaint to medical personnel after his COVID-19 test result was for epigastric pain associated with heartburn. *Id.* at 8. This pain was determined to be related to gastro-esophageal reflux disease without

esophagitis, and he was provided medication. *Id.* at 5.

Petitioner asks the Court to consider the opinion of Dr. Allen Keller, MD, a general internist in New York who has not seen or treated Petitioner. Keller's opinion is based on his review of Petitioner's medical records as well as his telephonic conversation with Petitioner and his brother-in-law. D.E. 14-2 at 1, 14-3. Dr. Keller provides that Petitioner's ECDF medical records do not contain information about Petitioner's hospitalization for pneumonia a year prior to his detention. D.E. 14-3 at ¶ 14. He also provides that Petitioner's ECDF medical records do not reflect all of his complaints to the medical staff. *Id.* at ¶¶ 27-28. Dr. Keller also appears to raise concerns with Petitioner being cohorted with other COVID-19 positive detainees. *Id.* at ¶¶ 18-19.

At the hearing, the Court asked Respondents to follow-up with additional information about COVID-19 patients' access to medical care, outside of scheduled visits, in the event their symptoms worsen and how quickly the facility can transfer a detainee to a hospital. D.E. 12. Respondents filed a letter informing the Court that ECDF health administrators provided, among other things, as follows:

> A healthcare provider is on-site at ECDF twenty-four hours a day, seven days a week. Petitioner is housed in a dormitory that is always staffed by an officer. If Petitioner wants to see a healthcare provider, he need only make a verbal request to the officer. In addition, the officer asks the detainees whether they would like to see a healthcare provider every morning and night.

D.E. 13 at 1-2.

Furthermore, the facility administrators provide that health care providers consider a range of symptoms such as, breathing rate, oxygen saturation below 95 percent, color changes, body temperature and heart issues, in order to determine whether transfer to a hospital is necessary. *Id.*

13

at 2-3.

Petitioner who is forty-one years old and otherwise healthy, does not indicate that he is living with an underlying health condition that may make him particularly susceptible to any severe illness stemming from contracting the virus. Moreover, Petitioner's condition appears to be improving. D.E. 11-10 at 6. Less than ten days after Petitioner's positive COVID-19 test result, his medical records indicate that his temperature was 97.9 F and his oxygen saturation was 99%. *Id.* at 6. The records reflect that ECDF medical staff have been responsive to Petitioner's needs as it relates to issues associated with COVID-19 or any other ailments. There is no objective information that supports that Petitioner is getting a sub-standard level of care at the facility, particularly with his mild symptoms and medical records. The Court notes Petitioner's dissatisfaction that he is often seen by medical personnel that are not doctors. Nonetheless, Petitioner is checked by medical staff daily. As a result, he has not shown that the legitimate governmental interest has been overcome.[8] *See Camacho Lopez v. Lowe,* Civ. Action No. 3:20-

---

8 Petitioner raises a "deliberate indifference" claim in his letter dated April 24, 2020. D.E. 14 at 2. Because the current pandemic represents unchartered territory in recent jurisprudence, the parties are understandably drawing from analogous situations. One of those situations is cruel and unusual punishment under the Eighth Amendment, which applies a deliberate indifference standard to medical treatment (or lack thereof). *See*, e.g., *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkelll v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017); *King v. Cnty. Of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008). "To act with deliberate indifference to serious medical needs, is to recklessly disregard a substantial risk of serious harm." *Harvey*, 263 F. App'x at 191 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

However, the Court finds that the Eighth Amendment is not applicable because Petitioners are not convicted criminal inmates but civil immigration detainees. As noted, the Court evaluates the Petitioners' claims under the Due Process Clause of the Fifth Amendment, which prohibits "punishment" of a civil detainee. *See Natale*, 318 F.3d at 581; *see also Hubbard v. Taylor*, 399 F.3d 150, 157-60 (3d Cir. 2005). As a result, the Court finds that the deliberate indifference standard merely sets the floor, rather than the ceiling, of constitutionally required medical care in this matter.

563, 2020 WL 1689874 *8 (M.D. Pa., Apr. 7, 2020) (observing that immigration detainee, who was positive, was "isolated from society at large, restricted from spreading this highly contagious virus within the community, and receiving appropriate medical care").

B. Petitioner's Right to Communicate with Counsel

Petitioner next submits that his confinement during this pandemic, impedes him from communicating with his counsel about his immigration proceeding, therefore violating his right to confidential communication with counsel as well as his access to the courts. D.E. 1 at 14-17. Petitioner submits that the nationwide orders to refrain from non-essential travel prohibits his counsel from visiting him at ECDF, therefore reducing his means of communication with counsel to cell phone or email, neither of which protect his privacy.[9] *Id.* at 14-15. Petitioner cites to allegations of other New Jersey detention facilities where inmates reported "threats and intimidation by guards when they're heard discussing conditions on the phone." *Id.* at 15.

Respondents argue that Petitioner's purported limitation on his access to counsel should be brought before an administrative tribunal, rather than as a Fifth Amendment conditions of confinement claim. D.E. 11 at 22.

As for Petitioner's claim that the current restriction violates his right to access the courts, that doctrine does not apply in this context. *See Lewis v. Casey*, 518 U.S. 343, 346 (1996) ("[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from trained persons in the law." (citations omitted). The right articulated in *Lewis*, applied to prisoners' right to legal resources in their criminal sentence, appeal,

---

9 Petitioner submits that counsel can only be reached by cellphone because his access to a landline phone is temporarily hindered while his office is closed due to COVID-19.

collateral proceedings or civil rights actions. *Id.* at 355. "[A] prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury" by hindering his efforts to pursue such a claim or defense." *Alexis v. U.S. Dep't of Homeland Sec.*, Civil Action 05-1484 (WJM), 2005 WL 1502068, *9 (D.N.J. June 25, 2005). Here, Petitioner's right to communicate with counsel stems from his Fifth Amendment due process rights. *See Biwot v. Gonzalez*, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in the Due Process Clause and codified at 8 U.S.C. § 1362 and 8 U.S.C. § 1229a(b)(4)(A)."[10]

Petitioner has not alleged any facts to suggest that he has suffered an injury in his immigration proceeding as a result of the facility's restriction on attorney visits. Petitioner's argument that the means of communication with counsel that are currently available to him, violate his privacy, is speculative. Petitioner has not indicated what, if any, untoward conduct the facility staff exhibited after Petitioner spoke with his counsel on the phone. Moreover, the declaration submitted by Warden Rodriguez indicates that petitioners are allowed to speak on the telephone with counsel, five days a week, in a designated private area. Further, there have been no allegations of Petitioner raising any grievances about his telephone use or access. To the extent that Petitioner would prefer to contact his counsel on a landline for security purposes, counsel can make efforts to accommodate Petitioner's desire. In other words, the use of a cell phone, rather than a landline, appears to be an issue that needs to be rectified on his counsel's end of the communication.

Under the totality of the circumstances, the Court does not find that Petitioner is likely to

---

10 It is unclear whether this right extends to all immigration proceedings including those following an immigration court's final order of removal, such as the case here.

16

succeed on his claims.    Petitioner's request for a TRO is therefor denied.

**IV.    Conclusion**

The Court denies without prejudice the Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 as well as the request for a temporary restraining order   D.E. 1.   An appropriate Order accompanies this Opinion.

Dated: 5/4/2020

_____
JOHN MICHAEL VAZQUEZ
United States District Judge
